Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 5292 | **DATE** | 9/17/2001 |
| **CASE TITLE** | TRANSCAP ASSOCIATES, INC. vs. CIGNA INSURANCE CO. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: Transcap's motion for summary judgment is hereby granted and Cigna's denied [11-1, 13-1].
(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | Document Number |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | SEP 18 2001 date docketed | |
| ✓ | Docketing to mail notices. | | | 34 |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| TBK | courtroom deputy's initials | 01 SEP 17 PM 3:16 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

DOCKETED
SEP 18 2001

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

TRANSCAP ASSOCIATES, INC., )
)
)
)
Plaintiff, )
) No. 99 C 5292
v. ) Judge Ronald A. Guzman
)
)
CIGNA INSURANCE COMPANY, )
)
)
)
Defendant. )

## MEMORANDUM OPINION AND ORDER

Pending are cross motions for summary judgment pursuant to Fed. R. Civ. Proc. 56. For the reasons set forth below Plaintiff's motion for summary judgment is granted and Defendant's motion for summary judgment is denied.

## BACKGROUND FACTS

This is an insurance coverage action brought by Plaintiff Transcap Associates, Inc. ("Transcap") against its Commercial Inland Marine Insurer Defendant Cigna Insurance Co. ("Cigna"). In Count I of this action, Transcap seeks damages against Cigna for breach of contract as a result of Cigna's failure to honor its contractual duties and obligations under the Commercial Inland Marine Policy issued by Cigna to Transcap. In Count II, pleaded in the alternative, Transcap seeks to equitably estop Cigna from denying that its policy provides coverage to Transcap for the loss at issue because Transcap reasonably relied to its detriment on the false representations of coverage made by Cigna's underwriter.

This action arises out of a misappropriation by a warehouser of more than $2 million in

computer chips. Transcap provides "purchase order financing" to manufacturers who seek funds in order to meet purchase orders placed by their customers. As part of the financing process, Transcap purchases and acquires the ownership rights to the component parts that the manufacturer will use to fulfill the purchase order with its customer. These component parts are held in a segregated warehouse space by the customer. When the manufacturer receives a purchase order, it is assigned to Transcap. Transcap then instructs the warehouser to ship or release the product to fill the purchase order exclusively upon Transcap's written direction. Transcap then collects proceeds of the purchase order from the customer, deducts its inventory cost and fees, and remits the remaining proceeds to the manufacturer.

In August of 1995, Transcap asked its insurance broker, The Lubin-Bergman Organization ("Lubin-Bergman"), to obtain insurance coverage that would, among other things, cover the risk of theft or misappropriation of Transcap's inventory by manufacturers and warehousers. Lubin-Bergman approached a number of insurers in order to obtain an "all-risk" insurance policy which would provide such coverage, including Defendant Cigna. During the policy placement process, Robert L. Lubin, President of Lubin-Bergman, provided various insurers with background information about the nature of Transcap's business, and the all-risk nature of the coverage sought. The underwriter of Cigna's policy does not recall discussing with anyone from the Lubin Organization coverage in bailment situations but does not dispute Cigna's knowledge regarding the nature of Transcap's business as evidenced by the description of property covered.

Transcap ultimately purchased a Commercial Inland Marine Policy written by Cigna (the "Policy"), effective September 22, 1995. Transcap renewed the Policy in 1996 and again in 1997.

The property covered by this policy as described in the amended endorsement to the policy reads as follows:

> **PARAGRAPHS 1 & 2 UNDER ITEM 1 COVERED PROPERTY IS AMENDED TO READ AS FOLLOWS:**
>
> **1. COVERED PROPERTY, AS USED IN THIS COVERAGE FORM MEANS:**
>
> **"PERSONAL PROPERTY" WHICH YOU OWN, LEASE OR FINANCE WHILE IN THE CARE, CUSTODY AND CONTROL OF OTHERS AND WHICH IS UNDER YOUR WRITTEN CONTRACT; OR OFF LEASE PROPERTY WHICH YOU HAVE REPOSED AND WHICH WAS PREVIOUSLY UNDER YOUR WRITTEN CONTRACT OR FINANCE AGREEMENT.**

Exclusion 5 of this policy provides the following:

> **Dishonesty**     **We won't cover loss caused or resulting from any dishonest act or omissions done either by you, your partners, your officers or your employees (whether they are working or not), or by anyone authorized to act for you.**

Exclusion 11 of the policy provides the following:

> **Disappearance**  **We won't cover loss caused by or resulting from the mysterious disappearance of property or an inventory shortage.**

On April 1, 1997, Transcap entered into a Master Purchase Order Assignment Agreement with Ulysses Memory Corp. ("Ulysses"). Under this agreement, Ulysses agreed to assign to Transcap customer purchase orders for computer components, and Transcap agreed to purchase the materials that would allow Ulysses to manufacture the ordered goods.

During the same time period, Transcap, together with Ulysses, entered into a warehousing agreement (the "Warehousing Agreement") with MGV International, Inc. and

MGV Manufacturing, Inc. (collectively the "MGV Entities"), pursuant to which the MGV Entities agreed to store goods acquired by Transcap to fill Ulysses' purchase orders.

Ulysses Memory Corporation, MGV International and MGV Manufacturing share common ownership and operate from the same facility. The Warehousing Agreement provided that Transcap's good were to be maintained in a location separate from any other party's goods and clearly identified as Transcap's goods. The Warehousing Agreement also provided that the MGV Entities were to ship Transcap products only upon the specific written direction of Transcap. A Master Purchase Order Assignment was also entered into between Ulysses and Transcap. This assignment provided the following:

### 4. Appointment of Manufacturer

(a) Subject to the other provisions of this Agreement, with respect to all Accepted P.O.'s (and only so long as such P.O. remains an Accepted P.O.) [Transcap] hereby appoints [Ulysses] as [Transcap's] exclusive source for acceptance of all manufacturing, processing and warehousing with respect to the conversion of Materials into Products, and the delivery of Products to Customers, and [Ulysses] hereby accepts such appointment. [Transcap] acknowledges and agrees that Manufacturer may subcontract the manufacturing, processing and warehousing processes to MGV Manufacturing, Inc. [Ulysses] agrees to perform, or cause its subcontractor to perform, all of [Ulysses'] obligations pursuant to Section 4 in a good and workmanlike manner, to utilize quality control procedures consistent with the standards of [Ulysses] and the industry, and to otherwise comply with each of [Ulysses] and the industry, and to otherwise comply with each of [Ulysses] specifications.

(b) So long as any Materials or Products are located at the Premises or are scheduled for delivery to the Premises, [Ulysses] agrees to warehouse, or cause its subcontractor to warehouse all Materials and Products and, with respect to such warehousing obligations, [Ulysses] agrees to perform, or cause its subcontractors to perform, in accordance with all of [Ulysses'] Specifications.

(c) [Ulysses] has the right and power and is duly authorized and empowered to enter into, execute, deliver, and perform this Agreement and all agreements and documents described herein.

On April 1, 1997, Transcap also entered into a Warehouse Agreement with MGV international, Inc. and MGV Manufacturing, Inc. (collectively, "MGV Entities") and Ulysses which provided as follows:

> A. The Warehouse and the Manufacturer are parties to one or more agreements ("the Warehouse Agreement") pursuant to which the Warehouse agree to receive, store, maintain, ship and otherwise perform warehousing services in connection with goods delivered by the manufacturer to the Warehouses, and the Manufacturer agrees to pay fees in connection with such services.
>
> B [Ulysses] and [Transcap] intend to store and ship the Transcap products in accordance with the provisions of the Warehouse Agreements.
>
> A. Direction to ship or Release. Without limiting the generality of the grant of rights set forth in Section 1 above, [Ulysses] further hereby irrevocably directs [MGV] to ship or otherwise release Transcap Products exclusively upon the Written direction of [Transcap].

On or about August 1998, without Transcap's knowledge or authorization, the MGV Entities shipped 739,886 computer chips valued at $2,007,721.55 from Transcap's inventory at MGV's warehouse in Commerce, California. Despite Transcap's demands, the chips have not been returned and no payments have been made. Transcap timely notified Cigna of the loss on or about August 17, 1998.

On or about August 21, 1998, Cigna assigned General Adjustor Dean Bieser to investigate Transcap's claim, under the direction of Greg Bristow, the Home Office Superintendent for the Inland Marine Line. Bristow had ultimate authority to make the coverage decision for the claim.

On October 7, 1998, Bieser issued his First Formal Report to File in order to summarize

the status of his investigation and set out a going-forward strategy. This report does not discuss any exclusions that might apply. On October 20, 1998, Bieser issued a reservation of rights letter to Transcap. Bieser advised Transcap that three policy exclusions potentially were applicable: (i) the Dishonesty Exclusion; (ii) the Disappearance Exclusion; and (iii) the Voluntary Parting with the Property Exclusion.

In his October 21, 1998 Second Formal Report to File, Bieser noted that he had previously concluded that the Dishonesty Exclusion did not apply, but that his conclusion "has since been challenged." Bieser also summarized his efforts "to clarify" the "authorized to act for' language" in the Dishonesty Exclusion. He advised that he had reviewed Property Loss Research Bureau ("PLRB") materials sent to him by Bristow, but that he had "[found] little there to clarify the 'authorized to act for' language." Bieser identified the central question in determining the applicability of the Dishonesty Exclusion as follows: "With 'authorize' meaning 'to give legal power to', is a bailee holding goods for another considered to be legally empowered to act for the bailee?" This question went unanswered. Bieser also unequivocally reported that because the MGV Entities and Transcap knew where and how the chips were shipped, "[t]he nature of this incident is not one for which the [Disappearance] [E]xclusion pertains."

On December 8, 1998, Bieser issued his Third Report to File. In addition to repeating his conclusion that the Disappearance Exclusion did not apply Bieser's third report noted CIGNA's continued uncertainly with respect to the applicability of the Dishonesty Exclusion. Bieser once again identified the key question as "Is MGV authorized to act for Transcap?" Bieser concluded that whether MGV was authorized to act for the insured "may be a legal determination" and recommended "[the use of legal counsel for a coverage opinion." Despite Bieser's recommendation, CIGNA never obtained a coverage opinion.

On December 11, 1998, Bristow decided that coverage should be denied based on the Dishonesty Exclusion and the Disappearance Exclusion. On January 27, 1999, Bieser sent Transcap a denial of coverage letter that cited the Dishonesty Exclusion and the Disappearance Exclusion as the sole bases for denial of coverage. It is unclear from the record precisely what happened to these chips but executives of Transcap have stated by way of affidavits that "MGV either used [the computer chips] in internal production of memory boards or shipped them to third parties to satisfy trade debts." MGV's agent, Mr. Ganouna, identified the third parties as Micron and Nanya but would not elaborate. Transcap is currently suing these parties in California.

## DISCUSSION

Summary judgment is appropriate if the pleadings, answers to interrogatories, admissions, affidavits and other materials show that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(b). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). The party seeking summary judgment carries the initial burden of showing that no such issue of material fact exists. Pursuant to Rule 56(b), when a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue of material fact and that the moving party is not entitled to judgment as a matter of law. *See Anderson*, 477 U.S. at 250.

In making our determination, we are to draw inferences from the record in a light most favorable to the non-moving party. We are not required to draw every conceivable inference, but only those that are reasonable. *See DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F. 2d

-7-

326, 329 (7th Cir. 1987). The nonmovant may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; rather, the party must go beyond the pleadings and support his contentions with proper documentary evidence. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986). Rule 56 mandates the entry of summary judgment against a party who fails to establish the existence of an element essential to that party's cause of action. *See Celotex,* 477 U.S. at 422.

For cross-motions for summary judgment, each movant must individually fulfill the stringent requirements necessary to obtain summary judgment under Rule 56, such standards still being applicable. *United v. Ill. Central R.R.,* 998 F. Supp. 874, 880 (N.D. Ill. 1998). By filing cross-motions for summary judgment the parties do not waive trial, unless the judge disagrees. *Miller v. LeSea Broadcasting, Inc.* 87 F. 3d 224, 230 (7th Cir. 1996). Indeed upon cross motions for summary judgment, the court is not required to grant summary judgment as a matter of law for either side. *Brownlee v. City of Chicago,* 983 F. Supp. 776, 779 (N.D. Ill. 1997). Rather, the court will evaluate each motion on its merits, resolving factual uncertainties and drawing all reasonable inferences against the movant. *Brownlee,* 983 F. Supp. at 779. With these principles in mind, we turn to the merits of the motions.

The primary issue to be decided by this Court is the interpretation and application of the Dishonesty Exclusion of Cigna's Policy. Cigna argues that the policy specifically excludes from coverage losses caused by the dishonest acts of Transcap or "anyone authorized to act on Transcap's behalf." Cigna contends that Ulysses and the MGV Entities were authorized to act on Transcap's behalf.

The construction of an insurance policy and its provisions is a question of law, and the court must ascertain the intent of the parties when construing the policy. *Lapham-Hickey Steel*

*Corp. v. Protection Mutual Insurance Co.*, 166 Ill. 2d 520, 529, 211 Ill. Dec. 459, 655 N.E. 2d 842 (1995). A policy term is not rendered ambiguous because the parties disagree on its meaning. *River v. Commercial Life Insurance Co. v. Hecker*, 183 Ill. App. 3d 13, 15, 538 N.E. 2d 1277 (2d Dist. 1989). "To determine 'the meaning of the policy's words and the intent of the parties, the court must construe the policy as a whole [citations], with due regard to the risk undertaken, the subject matter that is insured and the purposes of the entire contract [citations].'" *Id.* quoting *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill.2d 90, 180 Ill. Dec. 691, 607 N.E. 2d 1204 (1992). Illinois law requires that this Court examine the plain language of the exclusion to determine if it is unambiguous. *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill. 2d 284, 620 N.E. 2d 1073 (1993). If the terms of the policy are clear and unambiguous, they must be given their plain and ordinary meaning. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 108, 607 N.E. 2d 1204 (1992). However, if a policy provision is ambiguous and susceptible to more than one reasonable meaning, the ambigous provision of the policy must be constured against the drafter of the policy. *Lapham-Hickey Steel Corp.*, 166 Ill. 2d at 530, 211 Ill. Dec. 459, 655 N.E. 2d 842; *Outboard Marine Corp.*, 154 Ill. 2d at 108-09, 180 Ill. Dec. 691, 607 N.E.2d 1204. In meeting its burden of demonstrating than an exclusion bars coverage, the insurer must demonstrate that application of the exclusion to the loss at issue is "clear and free from doubt." *Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co.*, 200 F. 3d 1102, 1108 (7th Cir. 2000), citing *Continental Cas. Co. v. McDowell & Colantoni, Ltd.*, 668 N.E. 2d 59, 62 (Ill. App. Ct. 2000)(internal Citations omitted).

The policy at issue is what is commonly known as an "all-risk" policy. Cigna on page 4 of its Memorandum in support of summary judgment argues that this policy was solely issued to

cover accidental damage to property. This argument is contradicted by the nature of the policy issued. As a general rule, an "all-risk" policy: is to be considered as creating a special type of coverage extending to risks not usually covered under other insurance, and recovery under an "all-risk" policy will, as a rule, be allowed for all fortuitous losses not resulting from misconduct or fraud, unless the policy contains a specific provision expressly excluding the loss from coverage. *13 A Couch Cyclopedia of Insurance Law* §48:141, at 139 (1982). [W]hen a person buys an 'all risk' policy, he or she is purchasing a special type of coverage which is intended to protect even against damage partially caused by an excluded risk and partially caused by an included risk. This is evidenced by the fact that the person buying an "all-risk" policy is paying for precisely that type of comprehensiveness. *Benke v. Mukwonago-Vernon Mutual Insurance Co.*, 110 Wis. 2d 356, 329 N.W. 2d 243, 246 (1982). Under an "all-risk' policy, "the only questions which need to be decided...are whether [the plaintiff] has suffered a loss and, if so, whether such loss is excluded from coverage under the policy. *Plaza 61 v. North River Ins. Co.*, 446 F. Supp. 1168, 1170 (M.D. Pa.), *aff'd*, 558 F. 2d 822 (3d Cir. 1978).

In general, inland marine insurance is used to insure both transportation risks and any type of goods or property that might be affected by the movement. Keeton & Widiss, *Insurance Law*, § 1.5(b)(2), p. 20. Inland Marine Insurance is applicable to land-based transit and has come to be the form of insurance applicable to communications ventures. "Examples of in-land marine exposures are property in domestic transit, **property in the custody of a bailee**, mobile equipment, buildings in the course of construction, electronic data processing equipment, and cable systems." *See* CPCU Handbook at 215.

In light of the undisputed fact that the policy in question is an inland-marine all-risk policy as well as the definition of the property covered by this policy we find, as a matter of law,

that the phrase **"anyone authorized to act for you,"** contained in the Dishonesty Exclusion clause, is ambiguous at best. In light of this ambiguity the terms of the exclusion as well as the policy must be construed in favor of Transcap and against Cigna.

Cigna acknowledges that the term "authorized to act for" is not defined in the Policy. Furthermore, it is undisputed that the covered property as defined in paragraphs 1 and 2 of the endorsement is as follows: **" any of Transcap's 'personal property' which you [Transcap] own, lease or finance while in the care, custody, and control of others and which is under your written contract."** This inland-marine policy was specifically issued to cover property which was owned, leased or financed by Transcap which was in the care, custody and control of others who were under written contract with Transcap. Obviously, Transcap would be required to enter into written contracts which would set forth the manner in which the goods would be held in the custody and care of others. While these contracts undisputedly grant certain contractual rights and authorities with respect to the storage of Transcap's goods, these contracts cannot be concluded to render any and all parties entering into this type of contract "authorized to act on Transcap's behalf." In the instant case, the Warehousing Agreement permitted the MGV entities to store and segregate the products purchased by Transcap and the Purchase Order with Ulysses gave Ulysses the authority to receive, process, warehouse and deliver Transcap's products. However, the Warehousing Agreement specifically "directed each Warehouse to ship or otherwise release Transcap Products exclusively upon the written direction of [Transcap].

To read the dishonestly exclusion to exclude anyone and everyone to which Transcap granted a contractual right would render the policy a nullity. If Cigna had intended to exclude a loss where a warehouseman/bailor's dishonest acts were a contributing factor, it could have drafted the exclusion to cover this precise situation. But it failed to do so. Rather, Cigna issued

-11-

an all-risk inland marine policy which precisely defined the nature of Transcap's business.

Furthermore, we agree Transcap that the terms of the Warehouse Agreement created a bailor/bailee type of relationship and is to be limited in its scope as to the specific authority granted to the MGV entities. The scope of a bailee's authority is dictated by the terms of the written contract by which it obtained possession of [the] property. *See Trailer Leasing Co. v. Scrappo*, 97 Ill. App. 2d 465, 469, 240 N.E. 2d 204 (1st Dist. 1968). The Warehouse Agreement set forth the rights and obligations of the parties, e.g. to store and deliver the computer chips only. The notion that a bailee is "authorized to act for" a bailor would lead to an impermissibly absurd result. *See State Farm Mut. Automobile Ins. Co. v. Universal Underwriters Group*, 674 N.E. 2d 52, 56 (Ill. App. Ct. 1996).

In arguing that the Dishonesty Exclusion applies, Cigna fails to differentiate between two distinct categories of actors-those authorized to act for an insured and those to whom an insured has merely entrusted property. Cigna argues that the MGV entities were authorized to act on Transcap's behalf, specifically, the MGV entities were authorized to warehouse Transcap's computer chips and the MGV entities acted dishonestly, to wit: they used the computer chips which Transcap entrusted to them for their own account. Cigna argues that the purposes of the dishonesty exclusion is to prevent coverage for the dishonest acts of people employed <u>in any</u> fashion by Transcap but there are no facts in this record to support the conclusion that Ulysses or the MGV entities were employees of Transcap. In fact the undisputed evidence reveals that the MGV entities and Ulysses were manufacturers and warehousers to which Transcap had no other relationship other than the purchase order financing. Moreover, there is no evidence in the record that Transcap empowered the MGV Entities to act on its behalf and it is undisputed that e whatever authority granted to the MGV entities and Ulysses was to subject to the condition

precedent–written direction to release by Transcap.

Moreover, a plain reading of the exclusion's wording lends itself to an interpretation which bars dishonest acts done by Transcap, its partners, its officers or employees or by anyone authorized to act for Transcap. Thus, its purpose "is to prevent dishonest acts by Transcap, acting in concert with its employees or with authorized persons. Literally, the exclusion addressed and encompasses the acts of dishonesty by Transcap or by employees on behalf of Transcap. This leads to the reasonable interpretation that the primary thrust is to exclude theft by Transcap or by employees on behalf of Transcap.

In light of the ambiguity in the policy we construe the policy in favor of Transcap and against Cigna. After examining the policy, and giving the contractual language its ordinary and plain meaning, we find that the policy provides for coverage for property while in the care, custody and control of others which is under Transcap's written contract. Because coverage has been found in favor of Transcap we need not address Transcap's estoppel argument set forth in its motion for summary judgment.

As to the portion of Transcap's claim disallowed by the Disappearance Exclusion we also grant Transcap's motion for summary judgment because Cigna's position conflicted both with Cigna's own claim handlers repeated admissions and because it is undisputed that the cause of loss was misappropriation by the MGV entities. Transcap's use of inventory records to prove the amount of the loss is perfectly appropriate.

## CONCLUSION

For the reasons set forth above Transcap's motion for summary judgment is hereby granted and Cigna's denied. (Docket Entries ## 11-1, 13-1).

SO ORDERED 9/17/01

ENTERED:

*Ronald A. Guzman*
HON. RONALD A. GUZMAN
United States Judge